2026 IL App (1st) 242199
Nos. 1-24-2199 & 1-24-2273 (consolidated)
Opinion filed July 10, 2026

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

STEPHANIE SALCEDO, Individually and as
Administrator of the Estate of Theresa M. Garcia,
Deceased,

       Plaintiff-Appellee,

v.

CYPRUS AMAX MINERALS COMPANY,
Individually, d/b/a and as Successor-in-Interest to
Sierra Talc Company, United Sierra Division of
Cyprus Mines, Cyprus Industrial Minerals
Company, Amoco Minerals Company, Cyprus
Georesearch Co., American Talc Company,
Metropolitan Talc Company, Inc., Charles
Mathieu, Inc., Imperial Products Co., Resources
Processors, Inc. and Windsor Minerals, Inc.;
CYPRUS MINES CORPORATION,
Individually, d/b/a and Successor to Sierra Talc
Company, United Sierra Division of Cyprus
Mines, Amoco Minerals Co., Cyprus Industrial
Minerals Co., and Cyprus Georesearch Co., a
Wholly-Owned Subsidiary of Cyprus Mines
Corporation and Successor to Charles Mathieu
Inc., d/b/a Charles Mathieu & Co. and Chas.
Mathieu Inc., American Talc Company Inc.,
Metropolitan Talc Company Inc., Imperial
Products Co. Inc., and Resource Processors, Inc.;
JANSSEN PHARMACEUTICALS, INC.,
Individually and as Successor-in-Interest to
Johnson & Johnson Subsidiaries Named Johnson
& Johnson Consumer Inc., Both Prior to and
After Its 2021 Restructurings and Colloquially
Known as "Old JJCI" and "New JJCI";

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the Circuit Court
of Cook County.

No. 20 L 004505

The Honorable
Patrick J. Sherlock,
Judge, presiding.

JOHNSON & JOHNSON; JOHNSON &
JOHNSON HOLDCO (NA), INC., f/k/a Johnson
& Johnson Consumer Inc., Individually and as
Successor-in-Interest to Johnson & Johnson
Subsidiary "Old JJCI"; KENVUE INC.,
Individually and as Successor-In-Interest to
Johnson & Johnson Consumer Inc.; LTL
MANAGEMENT LLC; and REVLON, INC.

   Defendants


(Johnson & Johnson; Johnson & Johnson Holdco
(NA), Inc.; and Kenvue Inc.,

   Defendants-Appellants).

---

   JUSTICE HYMAN delivered the judgment of the court, with opinion.
   Justice Pucinski concurred in the judgment and opinion.
   Justice Gamrath concurred in part and dissented in part, with opinion.

## OPINION

¶ 1    Theresa Garcia initiated litigation against Johnson & Johnson, alleging that its baby powder, which she used for nearly five decades, contained asbestos and caused her to develop mesothelioma, a rare and incurable cancer. Following Garcia's death, her daughter, Stephanie Salcedo, as administrator of Garcia's estate, pursued both survival and wrongful death claims.

¶ 2    After Salcedo sued, Johnson & Johnson created two new companies, Johnson & Johnson Holdco (NA) Inc. and LTL Management, LLC, to isolate its growing talc liability claims (Holdco and LTL, respectively). Holdco received the company's assets, and LTL received the company's liabilities, including talc claims. Johnson & Johnson also spun off its consumer health care products, including baby powder, into a third new company, Kenvue Inc. (Kenvue). Collectively, we refer to these defendants are referred to as "Johnson & Johnson."

¶ 3        After a four-week trial, the jury returned a verdict for Salcedo, awarding $45 million for her and her siblings, including $30 million for Garcia's claim brought under the Survival Act (755 ILCS 5/27-6 (West 2024)). The jury found Johnson & Johnson and Holdco each liable for 15% and Kenvue liable for 70%. In response to special interrogatories, the jury determined that Holdco and Kenvue were successors-in-interest to Johnson & Johnson, finding they were mere continuations of the company and continued to sell goods in the same product line.

¶ 4        The trial court entered judgment on the jury's verdict and denied Johnson & Johnson's motion for judgment notwithstanding the verdict, a new trial, or remittitur. The trial court later awarded Salcedo $2,657,835.92 in prejudgment interest. Johnson & Johnson appealed both orders separately, and we consolidated the appeals.

¶ 5        Johnson & Johnson contends it is entitled to (i) a remittitur of $30 million on the grounds that Illinois does not recognize damages for Garcia's claim brought under the Survival Act, (ii) reversal or a new trial due to evidentiary rulings on three witnesses, which denied it a fair trial, and (iii) judgment notwithstanding the verdict, asserting that Kenvue and Holdco should not have been found liable under successor liability principles. Additionally, Johnson & Johnson challenges the constitutionality of the statute mandating prejudgment interest in personal injury and wrongful death cases (735 ILCS 5/2-1303(c) (West 2024)).

¶ 6        We affirm. The trial court correctly instructed the jury on damages for Garcia's claim brought under the Survival Act and successor liability, and its evidentiary rulings did not deprive Johnson & Johnson of a fair trial. The injury at issue is not Garcia's death itself but the injury she experienced before death. Further, section 2-1303(c) is constitutional.

¶ 7                                 Background

¶ 8    Theresa Garcia was diagnosed with mesothelioma in January 2020 when she was 52 years old. Garcia sued Johnson & Johnson and others, alleging they were negligent in selling talc-based products containing asbestos. After Garcia died in July 2020, the complaint was amended to allow her daughter, Stephanie Salcedo, as administrator of her mother's estate, to bring claims under the Survival Act (755 ILCS 5/27-6 (West 2024)) and the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2024)). The second amended complaint alleged wrongful death, successor liability, fraudulent misrepresentation, willful and wanton misconduct, strict liability, and breach of implied warranties.

¶ 9                          Johnson & Johnson's Restructuring

¶ 10    Facing rising talc litigation claims, Johnson & Johnson undertook a complex, multi-step corporate restructuring referred to as a "divisional merger" or a "Texas Two Step." A Texas corporation can split into multiple successor corporations and divide its assets and liabilities among its successors as it sees fit. Tex. Bus. Orgs. Code Ann. § 10.001(a) (West 2015); Tex. Bus. Orgs. Code Ann. § 10.003 (West 2006). After the split, a creditor can generally only recover from the entity assigned its debt. Tex. Bus. Orgs. Code Ann. § 10.008(a)(3), (4) (West 2015). The successor company is not liable for its predecessor's tort liabilities unless it expressly assumes liability. *Id.* § 10.008(a)(4)

¶ 11    Before the divisional merger, Johnson & Johnson Consumer, Inc. (Old JJCI), a New Jersey corporation and a subsidiary of Johnson & Johnson, manufactured Johnson & Johnson's baby powder and was responsible for accompanying liability. Old JCCI's parent company, Janssen Pharmaceuticals, Inc., also a New Jersey corporation, created Chenango Zero LLC, a Texas limited liability company. Old JCCI merged into Chenango Zero, effectively becoming a Texas company. Chenango Zero was then divided into Chenango One LLC and Chenango Two LLC.

Chenango One assumed Old JJCI's talc liabilities and was renamed LTL Management, LLC. Chenango Two became known as Holdco and assumed Old JJCI's assets. LTL and Holdco are incorporated in New Jersey. The divisional merger agreement provided that the transaction would be "governed by and construed in accordance with the laws of the State of Texas."

¶ 12 Shortly after its creation, LTL filed for Chapter 11 bankruptcy, obtaining a stay of all talc litigation. The bankruptcy court denied the talc litigants' motion to dismiss, but the Third Circuit reversed, holding that LTL had $61.5 billion in assets and could "comfortably" meet its future liabilities. *In re LTL Management, LLC*, 64 F.4th 84, 108 (3rd Cir. 2023). Hours later, LTL filed for bankruptcy again after reaching a settlement agreement with numerous talc claimants. The bankruptcy court, however, dismissed the case, and the Third Circuit affirmed. *In re LTL Management LLC*, Nos. 23-2971, 23-2972, 2024 WL 3540467 (3rd Cir. July 25, 2024).

¶ 13 Johnson & Johnson also spun off its consumer health brand products, including its baby powder, to a newly created company, Kenvue, Inc. According to Kenvue's CEO, Thibaut Mongon, who testified by video deposition, the manufacture and marketing of Johnson & Johnson's baby powder remained unchanged after the spinoff. Most of Johnson & Johnson's consumer health employees and management transferred to Kenvue, which manufactured baby powder at the same facility Johnson & Johnson had used. Although Johnson & Johnson had discontinued talc baby powder sales in favor of cornstarch-based powder in the United States and Canada in 2020, Kenvue continued selling it in other countries. And U.S. consumers could purchase talc-based Johnson's baby powder in some stores and online as late as 2023.

¶ 14 Johnson & Johnson's Motion to Dismiss

¶ 15        Johnson & Johnson moved to dismiss Holdco, Kenvue, and Janssen under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2024)). Johnson & Johnson argued that LTL was solely responsible for talc litigation liabilities and that Garcia never purchased talc products manufactured by Kenvue or sold by Holdco, as they were not yet formed at the time of her use. Johnson & Johnson further argued that, because Kenvue and Holdco did not expressly assume Johnson & Johnson's liabilities, they cannot be found liable under Texas law.

¶ 16        The trial court, applying the most significant contacts rule of the Restatement (Second) of Conflict of Laws, found that New Jersey rather than Texas law applied. And New Jersey (and Illinois), unlike Texas, recognizes exceptions to the general rule of successor nonliability.

¶ 17                                              Trial

¶ 18        The jury heard testimony from (i) experts regarding whether the baby powder contained asbestos and caused Garcia's death from mesothelioma, (ii) Garcia's family members concerning her use of Johnson & Johnson's products and the loss they experienced, and (iii) company representatives addressing the corporate restructuring. We focus on the rulings on the testimony of three witnesses, which Johnson & Johnson contends denied it a fair trial.

¶ 19                                           Ed Kuffner

¶ 20        Ed Kuffner, M.D., Johnson & Johnson's chief medical officer for consumer health products since 2017, had responsibility for the safety of its products, including baby powder. Johnson & Johnson did not designate Kuffner as an expert witness under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). Instead, Salcedo called him to testify as Johnson & Johnson's corporate representative regarding the company's talc sourcing and its handling of talc-safety issues. Salcedo's attorney asked Kuffner if Johnson & Johnson tried to limit information about

the presence of asbestos in talc and about a 2017 voluntary recall after the Food and Drug Administration reported finding trace amounts of asbestos. In response, Kuffner said he prepared a health hazard evaluation that described the company's safeguards, affirmed the safety of the baby powder, and suggested that cross-contamination occurred in the FDA's lab.

¶ 21 When Johnson & Johnson questioned Kuffner, the trial court sustained objections on hearsay grounds to testimony about the company's handling of talc safety issues and sourcing of its talc before he joined the company. The trial court also barred his testifying about whether Johnson & Johnson's talc products contain asbestos or cause cancer, as those topics required expert testimony and Johnson & Johnson had not disclosed Kuffner as a Rule 213(f)(3) expert.

¶ 22                                           Mark Bailey

¶ 23 Mark Bailey is a geologist who specializes in identifying and analyzing asbestos in talc. He testified on Salcedo's behalf and opined that talc Johnson & Johnson sourced from mines in Italy and Vermont contained asbestos fibers.

¶ 24 At his pretrial deposition, Bailey said he could not testify about his testing of Johnson & Johnson's talc products because he was under a confidentiality agreement. His Rule 213(f)(3) disclosure never addresses his testing of those products. Before trial, the parties agreed Bailey would not testify about his testing of Johnson & Johnson's baby powder unless "he is cross-examined on an alleged failure to personally test [Johnson & Johnson's] baby powder, [Johnson & Johnson] takes the position that its global quality assurance programs ensured no asbestos in any [of its baby powder] worldwide[,] or the door is otherwise opened."

¶ 25 During opening statements, Johnson & Johnson's attorney referred to Bailey as the "testing guy" who "will tell you all about all the fancy equipment he uses and he's actually going to tell you that he himself has tested Johnson's Baby Powder in the past. But *** [h]e's not going

to tell you what he found because he tells us that he has a confidentiality agreement that prohibits him from talking about it. So, he's the testing guy who's not going to tell you what he tested."

¶ 26    On direct examination, Salcedo's attorney asked Bailey if his testing of cosmetic talc ever revealed asbestos. The trial court sustained Johnson & Johnson's objections, finding it outside the scope of Bailey's Rule 213(f)(3) disclosure.

¶ 27    During cross-examination, Johnson & Johnson's attorney asked Bailey if he had tested the baby powder in the past. He said he had, and Johnson & Johnson's attorney asked, "And you are not going to tell this jury about the testing you have done on Johnson's baby powder, right?" Bailey responded, "Not unless I'm asked about it." Johnson & Johnson asked him to clarify that the confidentiality agreement referenced at his deposition barred him from discussing those tests. Bailey said it did not because "since [Johnson & Johnson's] opening, we have internally taken a look at this one test that we have, and we do have a test of Johnson's baby powder that is not under a confidentiality agreement." He further stated that the confidentiality agreement "has been released" and that he would be "happy to talk about the testing." Nonetheless, neither side asked Bailey about his testing of Johnson's products.

¶ 28    After Bailey testified, Johnson & Johnson moved for a mistrial. It argued that Salcedo failed to timely supplement Bailey's expert disclosures to reveal that he was no longer under a confidentiality agreement and would testify about his testing of Johnson & Johnson's baby powder, if asked. Johnson & Johnson claimed prejudice because, in opening, it told the jury Bailey was the "testing guy" who would not say what he found. Bailey's statement on cross-examination that he could discuss testing, if asked, Johnson & Johnson argued, undermined its credibility and affected its cross-examination strategy.

¶ 29    The trial court denied the motion. It found that Bailey had agreed not to discuss his testing unless Johnson & Johnson opened the door, which it did by asking about it on cross-examination.

¶ 30                                    Steven Haber

¶ 31    Salcedo presented Dr. Steven Haber, M.D., a pulmonologist, to testify that Garcia's exposure to asbestos in the baby powder was a substantial factor in causing her mesothelioma. He also testified about asbestos's mineral structure and methods for identifying asbestos in talc. The court overruled objections that this testimony was beyond his expertise.

¶ 32                                     Verdict

¶ 33    The jury returned a verdict against Johnson & Johnson for $45 million, awarding Salcedo and her siblings $12 million on their wrongful death claim and $33 million on the survival claim. Of the $33 million, the jury awarded $30 million for Garcia's claim brought under the Survival Act and $3 million for her pain and suffering, loss of normal life, emotional distress, and disfigurement. In apportioning the award, the jury found Johnson & Johnson responsible for 15%, Holdco for 15%, Kenvue for 70%, and LTL for 0%. The jury answered special interrogatories, finding Holdco and Kenvue were successors-in-interest to Old JCCI because they were mere continuations of that company and marketed goods in the same product line.

¶ 34    The trial court entered judgment on the verdict and denied Johnson & Johnson's postjudgment motion for judgment notwithstanding the verdict, a new trial, or remittitur. Johnson & Johnson appealed.

¶ 35    Salcedo filed a motion for prejudgment interest, which the trial court granted, adding $2,657,835.92 to the judgment. Johnson & Johnson then appealed the prejudgment interest order. We consolidated the appeals.

¶ 36                                        Analysis

¶ 37        Johnson & Johnson contends the trial court (i) erred by allowing damages under the

Survival Act, (ii) abused its discretion by excluding testimony from Kuffner about whether its

talc contained asbestos and from Bailey about asbestos testing, which he had not disclosed

before trial, (iii) abused its discretion by allowing Dr. Haber to testify about topics outside his

area of expertise, (iv) erred by denying Kenvue and Holdco judgment notwithstanding the

verdict under principles of successor liability, and (v) erred under the constitution by applying

the prejudgment interest statute to what it characterizes as future damages.

¶ 38                                    Standard of Review

¶ 39        We review the trial court's grant or denial of a new trial or remittitur for an abuse of

discretion. *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 82. We review a ruling

on a judgment notwithstanding the verdict *de novo*. *Ries v. City of Chicago*, 242 Ill. 2d 205,

215 (2011) ("[Judgment notwithstanding the verdict] should be granted only when the

evidence and inferences therefrom, viewed in the light most favorable to the nonmoving party,

so overwhelmingly favors the movant that no contrary verdict based on that evidence could

ever stand.").

¶ 40                                   Survival Act Damages

¶ 41        Johnson & Johnson contends that Illinois does not permit recovery after a plaintiff's death

for what it terms "shortened life expectancy damages" and seeks a remittitur of $30 million or

a new trial on damages. It relies on *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002), and

*Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895 (2007), arguing that those decisions limit

recovery to plaintiffs living at the time of trial.

¶ 42     Illinois law does not turn on the term used to describe a claim. Johnson & Johnson's argument depends on treating "shortened life expectancy damages" as a freestanding category unavailable after death. But neither the Survival Act nor *Dillon* nor *Bauer* imposes that limitation. Garcia and later her estate sought recovery for a distinct loss caused while Garcia was alive: the loss of years of life mesothelioma took from her. The verdict form used the phrase "shortened life expectancy" to describe that loss, while separately compensating her for "loss of normal life." The former concerned the length of life taken from her, the latter the quality of the life she lived after injury.

¶ 43     Johnson & Johnson's argument transforms shorthand language on the verdict form into a freestanding category of damages that it then attacks as nonrecoverable. That reframing fails under Illinois precedent. When our supreme court addressed recovery for reduced lifespan in *Dillon*, it focused on whether the defendant's conduct caused a demonstrable injury to the plaintiff, one proved to a reasonable degree of certainty. *Dillon* confirms that the inquiry is about injury, not terminology.

¶ 44     In *Dillon*, our supreme court rejected barring recovery for harms tied to reduced lifespan, allowing recovery where the evidence establishes "to a reasonable degree of certainty that the defendant's wrongdoing created the increased risk." *Dillon*, 199 Ill. 2d at 500. Mesothelioma had already drastically curtailed Garcia's lifespan. *Dillon* emphasized that a plaintiff may recover "for *all* demonstrated injuries." (Emphasis in original.) *Id.* at 504. *Dillon* nowhere discusses a separate category called "shortened life expectancy damages." To the contrary, *Dillon* treats a proven loss of years of life as a compensable injury. The injury was not just the statistical risk of premature death, but the evidence established that mesothelioma had shortened her life.

¶ 45     *Bauer*, 377 Ill. App. 3d 895, applies the same analysis. It does not adopt Johnson & Johnson's label. *Bauer* follows *Dillon*, quoting its recognition that "life itself has value and that a defendant should be required to pay damages for wrongful conduct that reduces a plaintiff's life expectancy. A defendant should not be allowed to benefit from a reduction in a plaintiff's damages due to a decreased life expectancy when it was the defendant's wrongful conduct that caused the decreased life expectancy." *Id.* at 920-21.

¶ 46     Although the plaintiffs in *Dillon* and *Bauer* were living at the time of trial, neither case suggests that the injury disappears should the plaintiff die before judgment. The dissent infers a limitation the opinions themselves never articulate. The controlling inquiry is whether the injury was proven. Nothing in *Dillon* or *Bauer* conditions recovery on the plaintiff remaining alive through trial or judgment. That the plaintiffs survived to verdict does not make survival a condition of recovery.

¶ 47     The Survival Act preserves the decedent's existing claims; it does not create new ones. *Wyness v. Armstrong World Industries, Inc.*, 131 Ill. 2d 403, 411 (1989) (citing *National Bank of Bloomington v. Norfolk & Western Ry. Co.*, 73 Ill. 2d 160, 172 (1978)); *Moon v. Rhode*, 2016 IL 119572, ¶ 39 ("the representative steps into the shoes of the decedent and takes the rights of the decedent"). The Survival Act bars recovery for harms never sustained during life, but it does not extinguish injuries already suffered where death later occurs. The relevant inquiry is whether the injury accrued during the decedent's lifetime. Here, it did.

¶ 48     The Survival Act damages compensate Garcia for the loss of years of life, an injury she sustained once she learned that mesothelioma would have a drastic and permanent effect. This was not a recovery by the estate for "damages tied to lost years a deceased plaintiff never lived" (*infra* ¶ 104) but rather compensates Garcia for the loss of years of life that mesothelioma took

from her while she was alive. Garcia experienced and sued for that injury before her death; the Survival Act permits her estate to continue the claim.

¶ 49    Johnson & Johnson relies on the Illinois Pattern Jury Instructions, particularly Illinois Pattern Jury Instructions, Civil, No. 30.04.05 (approved May 2008) (hereinafter IPI Civil No. 30.04.05), to argue that damages presuppose a living plaintiff. It points to language in the Comment stating that IPI Civil No. 30.04.05 applies when the tort makes a plaintiff "likely to die prematurely" (IPI Civil No. 30.04.05, Comment) and, in the notes on use of IPI Civil No. 30.04.05, "[t]his instruction is appropriate if there is evidence that plaintiff's life expectancy has been shortened by the tort. It should appear as a separate element of damages on the verdict form." IPI Civil No. 30.04.05, Notes on Use. The dissent similarly reads IPI Civil No. 34.01, addressing "damages arising in the future" as limiting recovery to living plaintiffs. IPI Civil No. 34.01 (rev. Apr. 2022). From that premise, the dissent concludes that, once death occurred, the expectancy ended. *Infra* ¶ 106.

¶ 50    Pattern instructions guide how damages are presented to a jury. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 252 (2006) (instructions guide jury's damages determination). That is fundamentally different from the decision on whether an accrued claim survives death. The reference to a plaintiff "likely to die prematurely" describes the evidentiary setting in which these damages arise and does not impose a condition that the plaintiff must remain alive to recover. Pattern instructions do not expand or restrict substantive law (*Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, ¶ 36) and do not constitute binding authority. The Survival Act, which is law, does not require Garcia to survive trial to preserve a claim that accrued before death.

¶ 51        Johnson & Johnson also relies on *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, which does not compel a different result. Unlike the plaintiff in *Jefferson*, Garcia knew before her death that mesothelioma was fatal and had cut short her life. The jury heard that evidence. By contrast, in *Jefferson*, the plaintiff sought damages for disfigurement. *Id.* ¶ 55. After the jury began deliberating, the plaintiff died. Unaware of her death, the jury awarded future damages for pain and suffering, emotional distress, and loss of normal life. *Id.* ¶ 50. The appellate court held that, when the plaintiff died, the case became a survival action and her estate could not recover future damages she would never experience. *Id.* ¶ 52.

¶ 52        Johnson & Johnson mischaracterizes Garcia's Survival Act claim as seeking damages only for future harm. The relevant question is when the injury arose. An injury does not become a future harm because its consequences continue into the future. Garcia's reduced lifespan was caused and known before her death. So her death did not create the injury; mesothelioma did.

¶ 53        Nor does Johnson & Johnson's argument about double recovery have merit. Double recovery occurs when the same injury is compensated twice. That is not what happened here because the Survival Act and Wrongful Death Act compensate different injuries suffered by different claimants. The Survival Act compensates Garcia for injuries she suffered before death (755 ILCS 5/27-6 (West 2024)), while the Wrongful Death Act compensates the losses her next of kin suffered as a result of her death. 740 ILCS 180/1 (West 2024).

¶ 54        The Survival Act damages compensate for reduced lifespan and do not duplicate the distinct losses recovered under the wrongful death claim. *Bauer*, a case on which Johnson & Johnson relies, confirms that damages for pain and suffering coexist with damages for "decreased life expectancy[,] *** an independent element of damages in a personal injury

action, entitling a plaintiff to compensation for the years of expected life lost due to a defendant's negligence." *Bauer*, 377 Ill. App. 3d at 920. This refutes a double recovery.

¶ 55        Finally, Johnson & Johnson's reliance on out-of-state authority is unpersuasive. Some jurisdictions, including Maryland and California, do not recognize this type of recovery; other jurisdictions apply materially different statutory schemes, like Michigan's, which expressly provides that damages are compensable only if experienced consciously "between the time of the injury and death." Mich. Comp. Laws Ann. § 600.2922(6) (West 2005). Illinois law recognizes that a plaintiff may recover for a curtailed lifespan, provided competent evidence supports it. Because Garcia sustained that injury before her death, the Survival Act preserved the claim for her estate. The absence of a prior Illinois decision involving these precise facts does not alter that conclusion; otherwise, the first case presenting a new factual variation could never be decided.

¶ 56        In addition, comparison to hedonic damages is misplaced. *Infra* ¶ 111. Whether the damages approach hedonic damages is not the point. Illinois law permits recovery for a proven reduction in lifespan as opposed to loss of enjoyment of life damages, which it does not permit. Compare *Bauer*, 377 Ill. App. 3d at 919-20 (allowing damages for decreased lifespan), with 735 ILCS 5/2-1115.1 (West 2024) ("There shall be no recovery for hedonic damages.").

¶ 57                    Trial Court's Rulings on Witness Testimony

¶ 58        Johnson argues the evidentiary rulings require reversal. Again, we disagree.

¶ 59        Evidentiary rulings, including determinations on the admissibility of expert opinions, rest within the discretion of the trial court. *Jones v. Beck*, 2014 IL App (1st) 131124, ¶ 16; see *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997) ("An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court.").

¶ 60    Johnson & Johnson challenges rulings regarding three witnesses: (i) Dr. Ed Kuffner, its corporate representative, (ii) Mark Bailey, and (iii) Dr. Steven Haber.

¶ 61                              *Kuffner Testimony*

¶ 62    Ed Kuffner became Johnson & Johnson's chief medical officer for consumer health products in 2017. Johnson & Johnson did not designate Kuffner as an expert witness, and he made no pretrial disclosures under Rule 213(f)(3). Salcedo called Kuffner to testify as a corporate representative. Her counsel questioned him about Johnson & Johnson's talc-safety sourcing and whether the company sought to prevent the public from learning that its talc contained asbestos.

¶ 63    On Johnson & Johnson's examination, the trial court barred testimony about matters that predated Kuffner's employment, finding he lacked personal knowledge as required by Illinois Rule of Evidence 602 (eff. Jan 1, 2011). Johnson & Johnson contends that Kuffner should have been able to testify about his review of FDA documents concerning (i) whether Johnson's baby powder was asbestos-free, (ii) the FDA's decision to place a warning label on the powder, (iii) a 1994 talc-safety symposium where participants questioned the link with cancer, (iv) Johnson & Johnson's effort to share talc-safety information, and (v) where Johnson & Johnson sourced its talc in the 1970s and 80s.

¶ 64    The court also excluded testimony offering opinions on whether Johnson & Johnson's baby powder contained asbestos or was safe, ruling that those opinions required expert qualification.

¶ 65    Johnson & Johnson argued Rule 206(a)(1) permits a corporate representative to testify about "matters known or reasonably available to the organization," even without firsthand knowledge. Ill. S. Ct. R. 206(a)(1) (eff. Oct. 1, 2021). The trial court rejected this argument, relying on *Union Pump Co. v. Centrifugal Technology Inc.*, 404 F. App'x 899 (5th Cir. 2010),

which applied the majority view of the federal equivalent to Rule 206(a)(1). In *Union Pump*, the Fifth Circuit held that the corporate designee may not testify at trial about "numerous matters that were hearsay and not within his personal knowledge" even though the information was within the corporation's knowledge. *Id.* at 907. Moreover, the rule permits "an *adverse* party to use that deposition testimony during trial." (Emphasis in original.) *Id.* at 907-08 (citing *Brazos River Authority v. GE Ionic, Inc.*, 469 F.3d 416, 434 (5th Cir 2006)). Kuffner was Johnson's corporate representative, not an adverse party.

¶ 66        Johnson & Johnson contends that, even if we follow *Union Pump*, the trial court erred in that much of Kuffner's testimony was derived from Johnson & Johnson's business records, so it falls within the hearsay exception for business records (Ill. R. Evid. 803(6) (eff. Jan. 25, 2023)) and ancient documents (Ill. R. Evid. 803(16) (eff. Jan. 25, 2023)) prepared before January 1, 1998.

¶ 67        Both Rule 803(6) and Rule 803(16) apply to admission of documents into evidence, not to the testimony of a corporate representative who has reviewed those documents. *People v. Brown*, 2021 IL App (3d) 170621, ¶ 35 (business records exception to hearsay rule allows records to be admitted into evidence but does not generally allow witness to testify about contents of those records). Johnson & Johnson has not suggested that this issue involves admission of documents into evidence. Furthermore, it is axiomatic that a corporate representative would review corporate documents before testifying. If that were enough to qualify as a hearsay exception, the personal knowledge requirement would be eviscerated. The requirement would also be eviscerated if, as Johnson & Johnson asserts, Salcedo opened the door by asking Kuffner what he learned from reviewing the corporation's documents.

¶ 68        The trial court also was justified in barring Kuffner from offering opinions that Johnson &

Johnson's baby powder contained no asbestos or was safe. These matters involve "scientific,

technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701(c)

(eff. Jan. 1, 2011). Johnson & Johnson did not disclose Kuffner as an expert, and as a lay

witness, Kuffner was not qualified to offer an opinion on the ultimate issue before the jury.

See *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 49 (Lay witness opinion testimony is both

"improper and prejudicial when it goes to the ultimate question of fact to be decided by the

jury.").

¶ 69        The trial court acted within its discretion by sustaining Salcedo's objections to Kuffner's

trial testimony.

¶ 70                                        *Bailey Testimony*

¶ 71        Johnson & Johnson next argues that Salcedo violated Illinois Supreme Court Rule 213 (eff.

Jan. 1, 2018) by failing to supplement expert witness Mark Bailey's disclosure. *Sullivan v.*

*Edward Hospital*, 209 Ill. 2d 100, 109 (2004) (Rule 213 disclosure requirements are mandatory

and subject to strict compliance.). Rule 213(f)(3) requires that a party disclose an expert's

qualifications, the subject of the expert's testimony, the expert's conclusions and opinions, and

reports the expert prepared. Ill. S. Ct. R. 213(f)(3) (eff. Jan 1, 2018). Rule 213(i) requires

parties to supplement or amend disclosures should new or additional information become

known. Ill. S. Ct. R. 213(i) (eff. Jan 1, 2018).

¶ 72        At his deposition, Bailey said he could not testify at trial about his testing of Johnson &

Johnson's talc products because of a confidentiality agreement. At trial, during cross-

examination, Bailey said the confidentiality agreement had been released and he would be

"happy to talk about the testing" if asked. Johnson & Johnson contends this testimony was an

unfair surprise undermining its trial strategy, citing *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 945 (2000).

¶ 73        *Copeland* is distinguishable. There, the expert offered new substantive opinions at trial that contradicted his deposition testimony. *Id.* Here, Bailey never testified at the deposition about his testing results. And Johnson & Johnson, unlike the defendant in *Copeland*, cannot claim surprise because it knew Bailey had tested its baby powder.

¶ 74        More significantly, the parties stipulated that Bailey would not testify about his talc testing unless Johnson & Johnson opened the door. Johnson & Johnson did just that by referencing the testing in opening statements and questioning Bailey about it during cross-examination. The trial court noted that Bailey's testing was not in his Rule 213 disclosure because the parties had agreed he would not testify about it but that Johnson & Johnson "interjected" it into the case. A party that introduces testimony on a subject cannot later claim prejudice from it. *Conner v. Ofreneo*, 257 Ill. App. 3d 427, 434 (1993).

¶ 75                                          *Haber Testimony*

¶ 76        Dr. Haber testified that Garcia's exposure to asbestos in Johnson & Johnson's baby powder was a substantial factor in causing her mesothelioma. Johnson & Johnson does not challenge that opinion but argues Haber, a pulmonologist, exceeded his expertise by discussing mineralogy, testing methods, and asbestos contamination. Johnson & Johnson asserts this testimony flouted the rule that experts cannot "parrot" another expert's opinion (*Citibank, N.A. v. McGladrey & Pullen, LLP*, 2011 IL App (1st) 102427 ¶ 18) or "summarize the results of the tests that he had not conducted and about which he [or she] could not testify on cross-examination." *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 55 (1984). Johnson

& Johnson claims prejudice due to the testimony being repeatedly raised during closing arguments, likely affecting the outcome and providing grounds for a new trial.

¶ 77      Expert witnesses may base their opinions on facts or data reasonably relied on by experts in the field, even if those facts are not independently admissible. Ill. R. Evid. 703 (eff. Jan. 1, 2011). Experts may also explain the basis for their opinions, including reliance on the work of other experts. *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 75 (citing *People v. Williams*, 238 Ill. 2d 125, 143 (2010), citing *People v. Lovejoy*, 235 Ill. 2d 97, 143 (2009)). The admissibility of facts underlying an expert's opinion remains within the discretion of the trial court. *Colella v. JMS Trucking Co. of Illinois*, 403 Ill. App. 3d 82, 91 (2010).

¶ 78      Johnson & Johnson argues Haber should not have been allowed to "parrot" the opinion of other experts in other disciplines. See *Citibank, N.A.*, 2011 IL App (1st) 102427 ¶ 18. Nothing in the record shows Haber merely repeated another expert's conclusions. Instead, he explained how the information informed his medical opinion, which is permissible. *Grauer*, 2019 IL App (1st) 180835, ¶ 75. Johnson & Johnson fails to show that the trial court abused its discretion in allowing Haber's testimony.

¶ 79                             Successor Liability

¶ 80      Johnson & Johnson contends the trial court improperly allowed the jury to impose successor liability on Kenvue and Holdco. Johnson & Johnson says neither entity sold talc products to Garcia and neither assumed old JCCI liabilities. According to Johnson & Johnson, under Texas law, which should govern, a successor is liable for a predecessor's torts only if the successor expressly assumes liability. And even under New Jersey law, it should prevail because Salcedo failed to present evidence to support applying exceptions to the general rule.

¶ 81                             *Choice of Law*

¶ 82     Before addressing successor liability, we must decide whether the trial court was correct in applying New Jersey law. A choice-of-law determination is required only when a difference in law will make a difference in the outcome. *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 307 Ill. App. 3d 92, 101 (1999). We agree with the parties that conflicts exist between Texas and New Jersey law on the issue of successor liability that affect the outcome. Under Texas law, a successor corporation cannot be held liable for a predecessor's torts unless it expressly assumes liability for them. New Jersey has a general rule on successor nonliability but recognizes exceptions, of which two are relevant: "mere continuation" and "product line."

¶ 83     Illinois has adopted the choice-of-law rules of the Restatement (Second) of Conflict of Laws. *Ingersoll v. Klein*, 46 Ill. 2d 42, 47-48 (1970). The Second Restatement provides that the law of the state with the most significant contacts to an issue governs. *Id.* In applying the Second Restatement, a court begins by characterizing the substantive law involved. *Id.*

¶ 84     Successor liability involves corporate law, so we look to sections 301 and 302 of the Second Restatement. Section 301 applies to "[t]he rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual," like a tort or a breach of contract. Restatement (Second) of Conflict of Laws § 301 (1971). Section 302 applies to issues involving the rights and liabilities of a corporation, other than those involving section 301. Restatement (Second) of Conflict of Laws § 302 (1971). If the issue falls under section 302, as here, the law of the state of incorporation will apply unless another state has a more significant relationship to the occurrence and the parties. *Id.*

¶ 85     Johnson & Johnson contends Texas has the most significant relationship to the corporate transaction that created LTL and Holdco because their precursors, Chenango One and Two,

were incorporated in Texas under Texas law and the divisional merger agreement included a Texas choice-of-law provision. Aside from short-lived Texas entities (Chenango One and Two) created solely for restructuring, the defendants have no meaningful connection to Texas. Holdco is a New Jersey corporation with its principal place of business in that state. Kenvue is incorporated in Delaware and has its principal place of business in New Jersey.

¶ 86    The internal affairs doctrine prescribes that matters relating to a corporation's internal governance should be controlled exclusively by the state of incorporation. *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 687 (2001). Neither Holdco nor Kenvue is a Texas corporation. Rather, they have significant ties to New Jersey, as the state of incorporation or principal place of business. The trial court appropriately applied New Jersey law.

¶ 87                              *New Jersey Law*

¶ 88    New Jersey law follows a general rule of successor nonliability but recognizes exceptions, including where (i) the purchasing entity is a mere continuation of the selling entity and (ii) the purchasing entity purchased a "substantial part of the manufacturer's assets and continu[es] to market goods in the same product line." *Lefever v. K.P. Hovnanian Enterprises, Inc.*, 734 A.2d 290, 292 (N.J. 1999).

¶ 89    Johnson & Johnson argues that successor liability should not apply because Salcedo had a remedy against LTL, which had assumed liability and was a named defendant. The cases Johnson & Johnson cites hold that successor liability may be inappropriate when the plaintiff retains a remedy against the company that manufactured the defective product, which, here, would be Old JCCI. See *Pacius v. Thermtroll Corp.*, 611 A.2d 153, 156 (N.J. Super. Ct. Law Div. 1992). Old JCCI, however, no longer exists. The trial court properly allowed the jury to

consider whether its successors, Holdco and Kenvue, were liable under two of New Jersey's exceptions.

¶ 90                                      *Product Line Exception*

¶ 91        Under the leading case, *Ramirez v. Amsted Industries, Inc.*, 431 A.2d 811 (N.J. 1981), a successor that acquires substantially all manufacturing assets and continues the same product line may be liable for defects in that line. *Id.* at 819. Important here is whether the successor corporation enjoyed the trade name, goodwill, and the continuation of an established manufacturing enterprise. *Id.* at 821-22. A strong reason for imposing successor liability is where the successor "benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers." *Id.* at 358.

¶ 92        Salcedo presented evidence that Kenvue continued selling talc-based baby powder outside the United States and marketed cornstarch-based baby powder under the Johnson name. Thus, the business, branding, and goodwill continued unchanged.

¶ 93                                     *Mere Continuation Exception*

¶ 94        New Jersey courts consider (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders. *160 West Broadway Associates, LP v. 1 Memorial Drive, LLC*, 248 A.3d 404, 411 (N.J. Super. Ct. App. Div. 2021).

¶ 95        The evidence showed continuity of management, employees, facilities, and operations after Old JCCI was dissolved and Holdco and Kenvue took over. The restructuring did not materially change how the baby powder business operated.

¶ 96        Viewed in the light most favorable to Salcedo, the evidence supported the jury's successor-liability findings. Judgment notwithstanding the verdict was not warranted. *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (judgment notwithstanding the verdict is properly entered only in limited cases where the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could stand).

¶ 97                                Prejudgment Interest Statute

¶ 98        Johnson & Johnson argues the prejudgment interest statute violates the right to a jury trial under the Illinois Constitution. Ill. Const. 1970, art. I, § 13. The prejudgment interest statute does not alter the jury's role in determining liability or damages. Prejudgment interest constitutes a ministerial function akin to the awarding of costs, imposing of postjudgment interest, or setting off the verdict to account for funds received from settling defendants. *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶ 49.

¶ 99        Courts in other jurisdictions have rejected similar challenges. See *Oden v. Schwartz*, 71 A.3d 438, 456-57 (R.I. 2013) (prejudgment interest statute rationally related to legitimate state interest and did not affect right to jury trial because prejudgment interest was not "damages"); *Galayda v. Lake Hospital Systems, Inc.*, 644 N.E.2d 298, 303 (Ohio 1994) (prejudgment interest statute "does not violate the fundamental constitutional right to trial by jury").

¶ 100       Johnson & Johnson also argues that prejudgment interest should not apply to future damages that a plaintiff has not yet incurred because the purpose of the statute is to compensate

the plaintiff for the delay in being made whole. Johnson & Johnson's argument recasts the recovery here as "future" damages. We have already rejected that premise.

¶ 101    Affirmed.

¶ 102    JUSTICE GAMRATH, concurring in part and dissenting in part:

¶ 103    I concur with my esteemed colleagues in all but one respect: their recognition of shortened life expectancy damages after Garcia's death. Here, the jury awarded $30 million in survival damages for 30 years of life Garcia never lived, in addition to $12 million for her wrongful death. The majority's decision will now turn shortened life expectancy damages into a routine component of every survival action paired with a wrongful death claim. If Illinois is to adopt this sweeping expansion of survival recovery, it should come from our supreme court or the general assembly.

¶ 104    The Survival Act permits recovery for harms the decedent suffered before death; the Wrongful Death Act compensates losses arising from death. *Wyness v. Armstrong World Industries, Inc.*, 131 Ill. 2d 403, 410 (1989). Future-oriented damages, such as future pain and suffering, prospective medical expenses, and increased risk of future injury, are recoverable only by living plaintiffs, because only they can experience those harms. See *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 52 (recognizing the distinction between living and deceased plaintiffs and restricting survival recovery to the plaintiff's lifetime); IPI Civil No. 31.10 (rev. June 2021) (limiting survival damages to the period between injury and death). Shortened life expectancy damages fall squarely within this category. They compensate a living plaintiff for the risk of premature death and the future harms that diminished expectancy entails. However, an estate cannot recover damages tied to lost years a deceased plaintiff never lived.

¶ 105        *Dillon v. Evanston Hospital*, 199 Ill. 2d 483 (2002), and *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895 (2007), are the only Illinois decisions touching on this form of risk-based recovery for future injury. Neither uses the phrase "shortened life expectancy," but IPI Civil No. 30.04.05 does, and it derives directly from these two cases. See IPI Civil No. 30.04.05, Comment. Absent *Dillon* and *Bauer*, and IPI Civil No. 30.04.05's codification of their reasoning, Illinois law provides no basis for awarding such damages.

¶ 106        Both *Dillon* and *Bauer* involved living plaintiffs who faced an increased risk of future death but who, under the single recovery rule, would have no later chance to pursue wrongful death damages. Their logic is simple: a tortfeasor should not "get off scot-free" when an injury is likely, though not certain, to shorten the plaintiff's life. *DePass v. United States*, 721 F.2d 203, 208 (7th Cir. 1983) (Posner, J., dissenting). Once the plaintiff dies, however, that concern disappears. A wrongful death action then compensates for the life cut short, leaving no doctrinal footing for layering shortened life expectancy damages on top of wrongful death damages.

¶ 107        The pattern jury instructions reinforce this limit. IPI Civil No. 30.04.05 and IPI Civil No. 34.01 make clear that shortened life expectancy is a form of future damages recoverable only by a living plaintiff. The comment to IPI Civil No. 30.04.05 explains that the instruction applies when the tort renders a plaintiff "likely to die prematurely" (IPI Civil No. 30.04.05, Comment), and its notes on use require IPI Civil No. 34.01 ("Damages Arising in the Future") to be given with it—a crucial step the trial court omitted. IPI Civil No. 30.04.05, Notes on Use. The notes on use further state that IPI Civil No. 30.04.05 applies when the plaintiff's life expectancy "has been" shortened. *Id.* This present-perfect construction presupposes a living plaintiff whose

condition persists into the present. It does not describe a deceased plaintiff whose life "was" shortened entirely in the past.

¶ 108    This limitation is reflected in practice. Since IPI Civil No. 30.04.05 was introduced in 2008, neither we nor the parties are aware of any Illinois case awarding shortened life expectancy damages after the plaintiff's death. That silence is unsurprising: the instruction derives solely from *Dillon* and *Bauer* and is inseparable from IPI Civil No. 34.01, which concerns only future harms a living plaintiff may experience. Just as survival damages cannot include future pain and suffering or medical expenses a decedent will never incur, they cannot include years of life the decedent never lived.

¶ 109    This understanding accords with the Restatement (Second) of Torts § 926 (1979), which limits survival recovery to harms sustained before death. Death fixes the scope of survival damages at that moment, foreclosing recovery for injuries that extend beyond it. Because shortened life expectancy damages rest on increased risk and future harm, they fall outside the Survival Act's reach.

¶ 110    Nothing here diminishes the severity of Garcia's injuries or the $3 million properly awarded under the Survival Act for her past pain and suffering, disfigurement, loss of a normal life, and emotional distress. This includes the anguish of knowing her life would be shortened, which could well support a higher figure. The problem lies in extending shortened life expectancy damages beyond their doctrinal limits and permitting an additional $30 million in survival recovery for 30 lost years of Garcia's life, plus $12 million for her wrongful death.

¶ 111    Limiting shortened life expectancy damages to living plaintiffs preserves the line between survival and wrongful death recovery and ensures survival damages end at death, as *Wyness*, *Jefferson*, and IPI Civil No. 31.10 require. Extending survival damages to years the decedent

never lived blurs that line, risks double recovery, and borders on hedonic damages. Because Illinois law, the pattern jury instructions, and long-standing practice confine risk-based, forward-looking expectancy damages to living plaintiffs, I respectfully dissent from that portion of the majority's analysis. I concur in all other respects.

*Salcedo v. Cyprus Amax Minerals Co.*, **2026 IL App (1st) 242199**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-004505; the Hon. Patrick J. Sherlock, Judge, presiding. |
| **Attorneys for Appellant:** | Michael A. Scodro, Brett E. Legner, Timothy B. Leake, and Anastasiya K. Lobacheva, of Mayer Brown LLP, and H. Patrick Morris and David F. Fanning, of Johnson & Bell, Ltd., both of Chicago, for appellants. |
| **Attorneys for Appellee:** | Christian Luciano Santiago, of Vogelzang Law, P.C., and David L. Franklin and Christopher M. Walling, of Massey & Gail LLP, both of Chicago, and Lisa W. Shirley, Rebecca Cucu, and Lina Chagoya, of Dean Omar Branham Shirley, LLP, of Dallas, Texas, for appellee. |